## In Re Anonymous No. 70 D.B. 81

Disciplinary Board Docket No. 70 D.B. 81.

NEUMAN, *Member*, September 23, 1983—Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the above captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On December 1, 1981, a petition for discipline was filed by the Office of Disciplinary Counsel, charging [ ], respondent, with violations of the following Disciplinary Rules of the Code of Professional Responsibility:

(a) D.R. 1-102(A)(4)—dealing with deceit and misrepresentation.

(b) D.R. 1-102(A)(5)—dealing with conduct that is prejudicial to the administration of justice.

(c) D.R. 1-102(A)(6)—dealing with conduct that adversely reflects on one's fitness to practice law.

(d) D.R. 5-101(A)—dealing with a lawyer's acceptance of employment when the lawyer's own personal interests may impair his independent professional judgment.

(e) D.R. 5-105(A)—dealing with accepting employment when his independent professional judgment will be or is likely to be adversely affected, or it would be likely to involve him in representing differing interests.

(f) D.R. 5-105(B)—dealing with continuing multiple employment when his independent professional judgment will be or is likely to be adversely affected or it would be likely to involve him in representing different interests.

An answer and new matter to petition for discipline was filed by counsel for respondent on De-

cember 24, 1981. The matter was referred to hearing committee [   ] consisting of [   ] , on January 7, 1982. On June 24, 1982, a hearing was scheduled for August 12, 1982. Hearings were held on August 12, 1982 and August 24, 1982. Respondent moved for dismissal on several grounds, resulting in the hearing committee deferring its ruling until reports had been received. The hearing committee filed its report on May 23, 1983, recommending public censure. On May 31, 1983, Disciplinary Counsel advised no exceptions would be filed to the report of the hearing committee. Respondent's brief on exceptions to the hearing committee report was filed on June 13, 1983 with a request for oral argument. On June 24, 1983, Disciplinary Counsel filed a brief opposing respondent's exceptions. Oral argument was heard by a three member panel of the Disciplinary Board on August 23, 1983, and the matter was adjudicated by the board on August 24, 1983. In its report, the hearing committee found violations of D.R. 1-102(A)(5) and D.R. 1-102(A)(6) dealing with conduct that is prejudicial to the administration of justice, and conduct that adversely reflects on one's fitness to practice law. The committee did not find a violation of D.R. 1-102(A)(4), prohibiting conduct involving dishonesty, fraud, deceit or misrepresentation, stating that the facts of the case did not apply to this rule. The hearing committee also found no violation of D.R. 5-101(A), dealing with a lawyer's acceptance of employment when the lawyer's own personal interests may impair his independent professional judgment.

The hearing committee did not find violations of D.R. 5-105(A) and (B) because it could find no specific evidence to prove that respondent was acting on behalf of anyone other than his clients and because multiple representation of Grand Jury

witnesses is not in and of itself a violation of Disciplinary Rules. The hearing committee also found no violation of D.R. 5-105(C) which permits multiple representation provided there is full disclosure to the clients of the potential for conflict of interest. Disciplinary Counsel did not charge respondent with violation of D.R. 5-105(C). Since there was no rebuttal to respondent's claim that he fully disclosed to each client that he was representing others, that there was potential conflict, and that each agreed upon his continued representation, the hearing committee found no violation of D.R. 5-105(C).

In requesting dismissal of the petition for discipline, respondent alleged in the answer and new matter in response to petition for discipline the following: unreasonable delay in the prosecution of this case; res judicata; and vagueness in the petition for discipline. All three charges were dismissed by the hearing committee as being without merit.

The Disciplinary Board agrees with the conclusions of the hearing committee and unanimously recommends public censure.

## II. STATEMENT OF FACTS

Respondent, [   ], was born in 1927, and admitted to the bar of Pennsylvania in 1963. His office is located at [   ]. In the Spring of 1974, following the death of [   ] County District Attorney [   ], respondent was appointed district attorney by the board of judges of the court of common pleas. In the primary election of 1975, respondent lost the Democratic Nomination for district attorney to [A] who subsequently won the office in November, 1975.

Following the November, 1975 general election, [B] held the office of County Coroner, and in May

1978, he became Chairman of the [ ] County Democratic Party. At the time of the May, 1979 Primary Election [B] was running for County Commissioner and [A] was running for district attorney, with the general election scheduled for November 6, 1979.

Late in 1978, the [ ] County Controller began an investigation into the activities, operations, and finances of the [ ] County morgue. The investigation reportedly was to include alleged improper and/or illegal conduct by the Coroner, [B].

In February 1979, at the request of [B], respondent furnished an opinion stating that the "professional education fund" which [B] had used as a receptacle for the deposit of funds received as the result of services performed at least in part from morgue employees aside from their duties under the County Code, was legal.

Following the May 1979 Primary Election, [B] was running for County Commissioner and [A] was running for district attorney in the general election.

In June 1979, the [ ] County Investigating Grand Jury was convened at the request of District Attorney [A]. The activities of [B], both as Coroner and in his private interests, became a subject of the grand jury investigation. In the meantime, respondent had represented certain morgue employees and others who worked with and for [B], when their testimony was subpoenaed as part of the controller's separate investigation.

As witnesses concerning [B's] activities were called by the Grand Jury, some of whom respondent had represented in the controller's investigation, respondent also represented, or expressed his intention to represent, those individuals before the grand jury.

. In September 1979, respondent represented [C] and [D], and in October 1979, he represented [E], in respect to their appearances before the grand jury. Also about October 1979, respondent indicated his intention to represent [F], [G], [H], [I], and [J].

In testimony before the hearing committee (N.T. 110; 239-302) it is not clear how many of these witnesses received *de facto* immunity but it appears that as many as seven and as few as four witnesses had such immunity. Grand jury attorneys had assured respondent that these witnesses were not subjects of the investigation and would not be prosecuted if they testified truthfully before the grand jury.

Sometime prior to October 17, 1979, respondent had occasion to speak with [K], Executive Assistant to District Attorney [A] in the hallway of the County Courthouse. (PE 2: 34-35). According to [K's] testimony in the criminal trial conducted in this matter, " . . . [Respondent] indicated to me he wanted to meet with someone who was close to [A] but who was not a paid political consultant . . . He specifically said he wanted to talk about the political campaign and [A's] future political activities. I said I would check and get back to him."

After checking with [A], [K] telephoned respondent and set up a meeting for October 17, 1979.

On October 16, 1979, respondent telephoned Assistant District Attorney [L], Chief Legal Advisor to the grand jury. Respondent asked [L] to consider the conversation to be "informal." Respondent stated that he would be meeting with a member of [A's] staff concerning the election. Respondent indicated that a determination would be made as to when [J] would appear before the grand jury. He further indicated to [L] that [L] should speak to the district attorney.

The following day, on October 17, 1979, [K] met with respondent in respondent's law offices. Respondent then read to [K] a typewritten document, which he gave to [K] after he had read it to him. The document, entitled "Confidential Notes of Possible Solution" (referred to hereafter as the memorandum), was given to [K] in the hope that [K] would present it to [A], and that [A] would adopt the solution outlined by respondent. Respondent indicated to [K] that "he had no authority for what he was doing."

In the memorandum, respondent proposed a solution to the pending grand jury investigation which, if implemented, would absolve [B] of any wrongdoing with respect to matters before the grand jury, without compromising [A's] political position, by making it appear that [A] vigorously pursued the allegations lodged against [B]. In order to achieve this result, respondent:

(1) Proposed that respondent would support [A] in his anticipated campaign for the election to the office of Attorney General of Pennsylvania.

(2) Noted that it would be necessary to heal some of the political "wounds" in [   ] County if [A] were to be a successful candidate for the office of Attorney General of Pennsylvania.

(3) Suggested that a miscue in "handling" the grand jury, in regard to his current investigation into the Coroner's office, would hinder [A's] prospect of securing the attorney general's office.

(4) Suggested a compromise between [A] and [B] which would result in "an ultimate and positive conclusion" by the grand jury, but which would also take [B] "off the hook."

(5) Proposed that witnesses, represented by respondent but described by respondent as "minor types," should continue to appear and testify before

the grand jury, but that "explosive witnesses" (such as [J], and other witnesses *not* represented by respondent) should be avoided.

(6) Proposed that a new code for the operation of the [ ˙ ] County Morgue and its Coroner should be presented by [B] and [A], jointly before the grand jury, and, subsequently, "the District Attorney should then address the grand jury and admit the value of the program."

(7) Suggested that after the presentation of the "proposed" code, [B] should leave the room and [A] should attempt to satisfy the grand jury that the new code is "good, protective of tax dollars and perhaps even go so far as to say that without [B's] talents and renown, these matters would have never come before them."

After reading the memorandum to [K], respondent said, "If you believe I can deliver [B], get back to me."

The following day, on October 18, 1979, respondent again called Assistant District Attorney [L], Chief Legal Advisor to the grand jury. Respondent informed [L] that he had a confidential conference with a member of [A's] staff, but did not identify with whom he had met. He told [L] that he should "contact the staff" with respect to [J's] appearance before the grand jury.

Sometime between October 17 and October 30, 1979, respondent again called [K]. Respondent informed [K] that he was writing a letter to the editor which would state that [A] had done a good job as district attorney. Respondent indicated to [K] that when he (respondent) had run for district attorney he had received 100,000 votes which was a "support base" he could provide to [A]. [K] asked respondent not to send the letter.

198

On October 30, 1979, respondent met with Attorneys [L], [M], and [N], all of the district attorney's office. At that meeting respondent stated "that it had already been decided that [J] would not be called before November 6, 1979 so as to allow the grand jury to issue a presentment on its own and explode before the election and damage the Democratic Party." [L] replied that no such agreement had been made, and the district attorney's office would continue to call witnesses in the order they saw fit.

Later that same day, October 30, 1979, [L] and [M] telephoned respondent to inform him that they were going to file a petition to disqualify him from representing any further witnesses before the grand jury. On October 31, 1979 a petition was filed by District Attorney [A] in the Court of Common Pleas of [ ] County, Criminal Division, Court Administration Docket no. 6, April term 2979, requesting respondent's disqualification from representing any additional grand jury witnesses. A hearing on the petition was held in camera by Administrative Judge [O] on November 14, 1979. On November 21, 1979, Judge [O] granted the petition for disqualification, thus preventing respondent from representing any further witnesses before the June, 1979 [ ] County Investigating grand jury.

On March 20, 1981, respondent was brought to trial and acquitted in the Court of Common Pleas of [ ] County at no. CC-8006340 before Judge [P]. The criminal proceeding brought against respondent alleged: (1) bribery in official and political matters; (2) obstructing administration of law or other governmental functions (18 Pa.C.S.A. §4701; 5101).

## III. DISCUSSION

This case involves two basic allegations that there was a conflict of interest on the part of respondent in representing multiple witnesses before an investigating grand jury; and that there was an attempt by respondent to control the outcome of a grand jury investigation through political enticements offered to the district attorney.

Members of the disciplinary board agree with the conclusions of the hearing committee that respondent did not violate D.R. 5-101(A), D.R. 5-105(A) and (B). The board also concurs with the finding that respondent did not violate D.R. 1-102(A)(4). The board concurs with the hearing committee that respondent violated both D.R. 1-102(A)(5) and D.R. 1-102(A)(6) as a result of his actions in attempting to direct the outcome of a grand jury investigation through his delivery of the "Memorandum" to a member of the district attorney's staff, and his various communications with members of the district attorney's staff. Such conduct is prejudicial to the administration of justice and adversely reflects on respondent's fitness to practice law.

Both in respondent's brief in support of exceptions to report of hearing committee 4.02 and at oral argument, counsel for respondent argued that the entire investigation of the coroner's office was politically motivated. Counsel also argued that the clients of respondent, who were potential witnesses, especially [J], were perilously placed in the middle of a political fight between the district attorney and the coroner. Further, respondent's position is that, given his understanding of the situation, he was duty bound to act on behalf of his clients to resolve, through legal means, the problem of a politically motivated investigation. The

Disciplinary Board, recognizing that this instance was not the first time in which a grand jury investigation was politically motivated, rejects the position of respondent that his actions were proper in order to protect his clients from suffering the consequences of the political motives of others. In fact, the record in this case when viewed as a whole, shows clearly that the witnesses were "bit players" in a larger scenario. For example, respondent suggests in his "Memorandum" that certain "minor type" witnesses appear before the grand jury, but that "explosive witnesses," including some who were *not* his clients, be avoided. To quote from the "Memorandum," "I would stay away deliberately from explosive witnesses of any kind that put you in a box and force the grand jury to demand of the District Attorney a decision before election that will create a permanent breach."

In the view of the Disciplinary Board, the main issue in the case is not respondent's representation of his clients, but rather his attempts to influence the outcome of the grand jury investigation. As the hearing committee notes, " . . . for whom respondent acted in preparing and delivering the 'Memorandum' is not relevant. The hearing committee believes that regardless of whom respondent was serving, the preparation and delivery of the 'Memorandum' was intended to involve the District Attorney of [ ] County in a conspiracy to mislead the grand jury in its investigation."

Furthermore, while an attorney must represent a client to the best of his or her ability, such representation must not be prejudicial to the administration of justice. Similarly, while it is appropriate for an attorney to request a district attorney to exercise discretion in the handling of clients before a grand jury, it is improper to also offer the district

attorney personal rewards in exchange for the use of that discretion.

The Disciplinary Board concludes that respondent did attempt to influence the outcome of the grand jury investigation into the coroner's office by brokering a political arrangement between the District Attorney ([A]) and the Coroner ([B]). Thus the Disciplinary Board concurs with hearing committee [ ] that respondent violated D.R. 1-102(A)(5) because his conduct was prejudicial to the administration of justice, and D.R. 1-102(A)(6) because respondent's actions adversely reflect upon his fitness to practice law.

## IV. RECOMMENDATION

The Disciplinary Board recognizes the serious nature of the charges brought against this respondent. Respondent has, however, maintained an otherwise exemplary career, and there is no record of prior disciplinary proceedings against him. Thus the Disciplinary Board recommends public censure before the Supreme Court as the appropriate discipline in this matter. The board further recommends that respondent pay the costs incurred herein.

Mr. Helwig abstained.

Messrs. Daniels, Krawitz and Curran did not participate in the adjudication.

## ORDER

ROBERTS, *C.J.*, And now, October 6, 1983, the recommendation of the Disciplinary Board dated September 23, 1983, is accepted, and it is hereby ordered that [Respondent] be subjected to public censure by the Supreme Court at the session of

court commencing October 17, 1983, in Philadelphia. It is further ordered that respondent shall pay costs, if any, to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Larsen did not participate in this matter.